Case number 14-5036. Florida Bankers Association et al. appellant v. United States Department of the Treasury et al. Mr. LaCard for the appellants, Mr. Weiner for the, excuse me, Mr. Weiner for the appellees. Good morning, Your Honor. Your Honor, this court sits to review rules that are arbitrary, and the IRS's decision to promulgate a mass data collection program, in this instance, is arbitrary, is counterproductive, and it doesn't make sense. What it does is it expands by 70-fold, 70-fold, a program that has never been shown to yield one cent in revenue to the United States. It purports to catch, to design to catch United States tax cheats by forcing financial institutions to define and identify the interest paid to non-resident aliens. The problem with that is the rule is easily circumvented. It was based on very thin evidence of U.S. tax cheats. Can I ask you about the Anti-Injunction Act? You certainly can. I know that's a subject that's of interest to you. It is, still. So, in NFIB, the Supreme Court said penalties in Subchapter 68B are thus treated as taxes under Title 26, which includes the Anti-Injunction Act. Why isn't that the end of the case? Because this is not a, because this is a Supreme Court ultimately rule, that wasn't a tax, that was a penalty. That was in a different chapter. That's the reason. It's the same result. As the Court held in Seven Skies, as the Court also held in Cohen, it was not a tax. Now, in your dissent in Cohen… No, no, no. I'm just talking about NFIB. But the reason that the Supreme Court relied on to decline to apply the Anti-Injunction Act was that the penalty was located in Chapter 48 rather than Subchapter 68. And they said if it had been located in Subchapter 68, the Anti-Injunction Act would have applied, as I read the case, and barred the suit from being heard at that time. Here we have a penalty that is in Subchapter 68B. But it's a penalty that's not really designed to collect a tax, Your Honor. That's the problem with it. In the, in Cohen versus… So you're going to the purpose. That's right. In Cohen, the case that you and Judge Henderson aptly dissented, and I think you were right on that, quite frankly, that clearly wasn't, no, it was clearly an excise tax. This isn't an excise tax. This is a penalty. Cohen was in the Anti-Injunction Act. No, but the question basically came down to the same litmus test. Could this Court, could a district court enjoin an IRS rule? And the position that was obviously taken by this Court, en banc, sitting, and in other courts, such as the Tenth Circuit case that we cited, is this. When you have a statute that is primarily not designed to get, as a tax, but instead is designed as an administrative regulation that the Court can sit, the Court can issue a declaratory judgment, the Anti-Injunction Act does not apply. Nobody's trying to stop the government from collecting the tax. Nobody's trying to stop the tax man from assessing anything. I think I know what your answer is going to be to this, but the Supreme Court in Bob Jones and American United, Alexander, and going back to the Bailey cases, it really rejected that bifurcated approach to the Anti-Injunction Act. In other words, when you're challenging a regulatory tax, you can somehow say you're challenging the regulatory aspect rather than the tax aspect. Well, that's right. We're talking about a regulation here that wasn't a tax, Your Honor. This is not a tax. Again, it is a penalty. What the Anti-Injunction Act was designed to do, the cases have made quite clear, is to stop litigants from preventing the United States tax authorities from collecting taxes or assessing taxes. We're not doing that. We're simply saying that the rule they announce is arbitrary and capricious. The Court has jurisdiction to consider that. The Anti-Injunction Act doesn't apply. When would a penalty in Subchapter 68B then be subject to the Anti-Injunction Act? I don't think so, Your Honor. I think the fact that it's fortuitously placed there, I don't think it should bar this Court from hearing a case under the Anti-Injunction Act. The only thing that concerns me about that is the Supreme Court seemed to say, as a blanket matter in NFIB, that if the penalty were located in Subchapter 68B, that's the end of it. I read that more as dictum than as a square hole, Your Honor. I think that the way they came down on that was the way the statute was interpreted was it was ultimately a regulatory program, not a taxing program. This isn't a taxing program. This is a program that's ostensibly designed to... I'll let you go on, but the Supreme Court specifically did not rely on that in NFIB. That had been argued to them, but they specifically did not rely on that ground. I know in Seven Sky it was present, but the government disagreed with that and the Supreme Court did not rely on that. But you can go on. Essentially, Your Honor, what the court did... I'm sorry, what the IRS did was they brushed aside comments as to the flow of capital from the United States. There's a one-line sentence. One-line sentence in the adopted rule which says, while a rationally situated nonresident alien will make decisions based on essentially reading tax treaties.  What they said also was this will deter United States tax cheaters. Let me give you some suggested reasons why it won't deter United States tax cheaters. First, the Canadian experience on which this is based has not been shown to have yielded anything. Secondly, there's a statute called FATCA that requires banks to document U.S. depositors and report U.S. taxpayers' income. Thirdly, let's assume that anybody here was a tax cheat wannabe. The problem with this regulation is it only applies to individuals. The IRS ignored comments from people such as Senator Levin, who was one of the prime sponsors behind this proposal, that if you're going to have an NRA reporting rule, you should extend it to corporations and other entities. There's nothing like that in this final rule. It only extends to individuals. The amount of the deposit that the nonresident alien has in the bank is not reported? It's only the interest? What's reported, Your Honor, is the amount of interest if it's more than $50 a year is my understanding. But what happens here... But the amount of the deposit is not reported? No, that's correct. Before this regulation, the banks didn't report anything in terms of interest earned on accounts held by nonresident aliens? That's correct. They reported nothing. But they had to know that the account was owned by a... or it was a deposit by a nonresident alien. Otherwise, they would have had to file whatever is a W-4 or whatever with the IRS, right? So the banks already have these records? No, I don't think that's accurate, Your Honor, at all. What the comment stated was that to report this sort of data was going to require tens of thousands of hours of records of work. That came from the Florida National Bankers Association. Why is that? If the bank knows that it doesn't and doesn't report this information to the taxpayer or the individual depositor and the IRS, it has to know that already. Forget about this regulation. But to report it, to put in computer programs, to train staff employees to handle this, to talk to NRAs who have questions about this, well, it takes man hours. For example, the ABA, the American Bankers Association, submitted eight pages in its record comments explaining the extra burden of this. The real vice of this is not so much the cost to the banks, although that's a factor. The real vice is twofold. If you were a tax-cheap wannabe, what are you going to do under this regulation? You're going to form a corporation or you're going to go to a non-treaty country. This only extends to 70 countries. In addition, NRAs are not required to submit the taxpayer identification number or Social Security numbers. So, again, you want to be a tax-cheap wannabe and an American who wants to pretend to be an NRA, there's nothing required overseas that requires Social Security numbers or tax identification numbers. And I'm not through with that. If you want to be a tax-cheap wannabe, you can do such things at a fairly simple, as you can invest in tangible assets and not have to worry about any of it. It's under-inclusive. It doesn't go to where Senator Levin pointed out and tax analysts, one of their primary comments was pointed out. It doesn't go to the source of a reported problem. And what was that problem? That's the real secret here. The problem was the Wiley brothers. The administrative record, Judge Henderson, two people, two Texas brothers who were misused NRA status, unfortunately were the connivance, according to Senator Levin, of banks. Two people justify this sort of a regulation. Now, let's talk about the cost of the regulation. I thought there was more to it than simply catching American citizens who claim to be non-resident aliens. What about the implementation of FATCA? Our position was and remains that this is simply duplicative of FATCA. FATCA, Your Honor, requires banks to tell the United States. Foreign banks. That's right. Yeah. But also, if United States citizens' income, interest is reported by banks to the Treasury. No, no, no, wait. The FATCA, has that gone into effect yet? Yes, it came into effect two years ago, Your Honor. I thought it was delayed until sometime this year. No, I think it came into effect two years ago, FATCA. Well, I'm not sure about that. Well, when it was passed is one thing, when it was implemented is another. But FATCA requires foreign banks to report to the Treasury Department the deposits held by U.S. citizens. That's right. That's right. And the argument that the IRS makes in the rulemaking is that in order to get the cooperation of foreign governments, which we need, that we have to reciprocate and report to the foreign government or whatever official that the income on accounts that their citizens have in the United States. Is that about it? That's correct, and it's an overstatement. The reason it's an overstatement is because they already have the ability to get information. They have had that information ability for years. What do you mean? They have the ability to go to foreign tax authorities and say, we want to exchange information. This is a mass program. This is a mass sharing of information where there are no procedures in place other than, trust us, we'll protect confidentiality. The United States authorities can do that. They can go to a foreign bank. Or a government. Or a government. Well, in Switzerland, they have to go to the government because it's a criminal offense for a bank to release tax or a depositor information, so they have to go to the Swiss government. And the Swiss government says, well, you know, we're not going to give you any information unless you give us information about Swiss citizens in your country. And so where does the IRS get that information but for this regulation? Your Honor, the way the IRS gets this information is by negotiating with government or by subpoenaing banks. Well, perhaps not in Switzerland, but they were successful in 2009. They had no trouble in 2009 getting information from UBS. That's all part of the record. The difficulty here, the difficulty in addition to the fact that it doesn't really solve any, quote, is the disintermediation and the effects on the economy. They ignored data in their own record that predicted a $26 billion outflow out of $400 billion of NRA deposits in the United States. That's not an insignificant amount of money. In fact, they also ignored data in the record that suggested as much as an $88 billion outflow from a smaller program that they proposed back in 2004. See, they've gone all over the place with this, with the idea of we need to have this global cooperation. They used that in 2001, and that was going to be supposedly for all countries. Then they dropped back and they said, okay, well, we'll do 15. And then that went nowhere, and suddenly, lo and behold, it became 70. It's just an empty slogan, Judge. They probably didn't do a cost-benefit analysis. They did nothing, although they were asked to assess what is the effect on the economy. Every member of the Florida House of Representatives, the congressional delegation wrote, the Texas senators wrote, the American Bankers Association, Florida Bankers Association, several others that I'll be happy to refer you to, said, do a cost-benefit analysis. If you're going to do this, we understand your concerns. If you're going to do a cost-benefit, if you're going to, before you jump, you should make some reasonable assessment. Let me ask you, the 6103K4 of the Internal Revenue Code authorizes the release of information of this sort so long as there's either a convention or a bilateral agreement, correct? That's correct. Okay. You mentioned the Florida delegation. Representative Posey wrote a letter to the Treasury Department. Are you familiar with that letter? It's in the record, I believe. And asked for the authority, what authority does the United States have to enter into bilateral agreements? You're not challenging that, are you? No. You're not claiming they have no authority? No. Okay. I see I'm almost at the end of my time. We'll give you some time to reply. Thank you. Good morning, Your Honors. May I please the Court, Andy Wiener for the United States Department of Treasury? Can I ask you, Mr. Wiener, does the bank have to – I have that form, but I don't have it up here with me. Does the bank under this reg have to report that it has no nonresident alien deposits, or does it just fill out this form if it does have? Under the regulations that are the subject of this rulemaking, I don't believe that there is a rule that you have to certify that you have no nonresident alien depositors. However, I cannot say definitively whether there is something else out there. Do we know how many banks in this country don't have nonresident alien accounts? No. No, Your Honor. I mean, that's one of the things that I believe was litigated more below and somewhat abandoned in this Court, which was below the associations that made the argument that, you know, the government doesn't know the lay of the land. And what our response to that argument was, well, the reason why we're instituting these reporting requirements is to collect such information as what you're asking about and what the taxpayers were saying below, that we don't know how many exact – we don't know the exact figure – we don't know exact figures in terms of nonresident alien deposits. And our response was, well, we need this reporting regime in order to collect that information, and it's unfair to attack the regulatory regime when it's trying to get that very information. Doesn't the bank also have to provide to the Treasury Department the citizenship of the depositor? No, the banks do not. The banks – what the banks – in response to your question in the opening, the banks have – when the account is opened, the banks require that the depositor fill out a W-8, which would be for a non – or which would declare the residency of a nonresident alien, and – or they have to – there's a mandatory withholding requirement. And so when that W-8 is submitted, it is maintained by the banks. It's, for example, like when you employ a nanny or a housekeeper and you have them fill out an I-9 that establishes that they're – that they are legal to be employed in this country. The I-9 is retained by the person who requests that information, which in this case would be the bank. But if the United States and the Treasury Department – is some identification number and the individual earned 200 bucks on a deposit in interest, that doesn't do you any good, does it? I mean, you have to know the nationality because otherwise – take a bilateral agreement with Switzerland. You wouldn't be giving Nigerian nonresident aliens earnings and interest. You would only be sharing Swiss citizens' interest. And so you have to know. Correct. And I don't – So how does the bank – or how does the United States know that? To clarify, this reporting requirement – I was just speaking to in general, but this reporting requirement requires that the banks report the identities and the nationalities of the depositors and how much interest they incurred if that interest exceeded $10 in the aggregate. And how does the bank make that determination? Based on the W-8 information when the account – when the depositor opens the account. And then, obviously, the bank knows how much interest that it paid to the depositor over the course of the year. And so there you've got – you've got all the information that the banks – the banks already have all the information they need to comply. The banks also have – about the individual's citizenship? The rulemaking addresses that issue. The banks are entitled to rely on the W-8s that are completed, except in the instance in which they have a reasonable belief to know that those are not true. So they have an obligation to follow up on information that they know that's being presented that's false. But they don't have an obligation. They are entitled to rely on the W-8. But to back up for one second, I wanted to pick up on Judge Kavanaugh's point that we don't think that this case should have ever reached the point, while we agree with the district court's ultimate determinations that the association's challenge to the – based on the Administrative Procedure Act and the Regulatory Flexibility Act is correct in rejecting those challenges, we think that the case should never have gotten that far because of the Anti-Injunction Act, which prohibits cases – which prohibits suits to restrain the assessment or collection of tax. What do you do with our decision in food service? Food services, I think, is in perfect accord with our position here. In food services, you had three regulations at issue. The one regulation – two of them were barred by the Anti-Injunction Act as going forward. And they were subject to a penalty that was provided under Subchapter 68B. In the third instance – Which was reporting of tips. The aggregate reporting of tips, Your Honor. Yes. And in the aggregate reporting of tips, first of all, it was subject to a penalty that was not under Subchapter 68B. And so it was not by statutory requirement a tax for all purposes under the Code, including the Anti-Injunction Act. Did the Court even mention that? No. The Court's reasoning was that because you're reporting aggregate tips for a congressionally mandated study of tip compliance, then it wasn't for the purpose of collecting tax because the aggregate figures wouldn't help the IRS at all in figuring out who was underreporting their taxable income. That's true here, too? No, it isn't, Your Honor. Because it's nonresident alien. You don't collect taxes. Yes, but we're not relying on that, Your Honor. What we're relying on is the fact that the reporting requirement is subject to a penalty under Subchapter 68B, which is defined as a tax. And so, therefore, by restraining this information reporting requirement, the Government would be restraining— I'm sorry, the Court, excuse me, would be restraining the IRS from collecting a tax under Subchapter 68B. And in food services, as we say, there are two regulatory requirements, which the— Was the penalty $100? $100. A year? Yes, per reporting requirement. And so— Is someone acting lawfully if they choose not to comply and to pay the penalty? That's how the bank would— if the banks wanted to challenge this reporting requirement— No, no, suppose they don't want to challenge it. They just say, well, we'll just not comply and we'd rather pay the tax. Are they acting lawfully? This was a question in NFIB as well that was asked. And to help you, the answer in NFIB was you can lawfully decline to purchase health insurance and just pay the tax. I'm curious if the same is true here. Well, just to admittedly think a little bit out loud here, because the Subchapter 68B penalties are defined as taxes for all purposes, they're clearly not a sanction, which you're arguably, you know, in the realm of and arguably the Anti-Injunction Act wouldn't apply to things outside of the tax regime that would be considered sanctions, like, for example, you know, a penalty for— Civil penalties that are not, yeah. Yeah. And so there I think that you would have a more— you would have a genuine question as to whether it would be, you know, like unlawful if it fell outside Subchapter 68. But within Subchapter 68, where it is considered a tax for all purposes, I wouldn't characterize it as illegal or unlawful not to pay your tax, so long as you report it and, you know, and then it would be assessed again. You would have to deal with the consequences of that. You would have to deal with any penalties. You would have to deal with, you know, the interest provisions that would apply. But as to whether it would be— No, you're paying the tax. You're paying the tax. You're just not reporting the information. You say, I don't want to report the information. I'm going to pay the tax. Right. Well, I mean, I guess the way that you would get there, no, because the way that you get there is by not reporting the information. I don't think that you—it's not like, for example, with the shared responsibility payment where you kind of have an either or. Here, you would not report the information, and then the IRS would assess the tax. I think that answer hurts you on the Anti-Injunction Act. I'm not sure it crushes you because you still have the language of NFIB, but— Right. But, well, I think that the NFIB is compelling. I think that there are equally other—there are other reasons that go beyond NFIB, which is, for example, there are cases, you know, NFIB is admittedly dictated because the court circumnavigated this issue and reached the merits of— Well, you can call it dicta. I don't think it's dicta. It's the specific reason they relied on for not holding the mandate subject to the Anti-Injunction Act. Right. Well, I guess, I mean, in the sense of they didn't— it's a case in which the Anti-Injunction Act wasn't applied. But there are other cases in which it was, you know, some of which are cited in our brief. For example, Mobile Republicans in the 11th Circuit, in which the organization, a 501c4, I believe it was, is required to report its donors or was going to be subject to tax on the amounts that was contributed to the organization. If you look at Crouch, which is a district court decision in the 9th Circuit, that specifically deals with the Subchapter 68B penalty that is assessed based on the failure to file— the failure to meet a reporting obligation. So that case, I believe, is squarely on all fours, both factually and legally with this case. And so I think that there is—the fact that the penalty here is under Subchapter 68B, which is defined as a tax, I think makes this easier than a lot of cases out there. Because you don't have to question whether it's a tax or something that's not really a tax. It just happens to fall under the Internal Revenue Code. So the issues that are raised by the plaintiffs in this case would be raised in a refund suit? Correct, Your Honor. Pay the tax and then see if it works. Yeah, if the banks want to challenge this requirement, what they have to do and what the Anti-Injunction Act has provided since the 1860s is to not impede the collection of the tax, is to pursue your relief in a refund context. Yes, Your Honor. Can I ask you if the intent of this is to get other countries to tell us what American citizens have in their foreign accounts so that we can tax that? And setting that aside, whether that's going to happen or not, don't you already have the information you need to give those countries? And here's my question. Is it a 1099 the bank files for interest? Is that the right number? For U.S. taxpayers. Okay. Let's say I'm a bank and I have 10 American citizens and I file 1099s for those 10 people reporting the interest earned. Do I also file as a bank, it seems to me I must, some sort of omnibus reporting that says, or at least 10 Americans earned $100 each on their interest. But we also, I mean our omnibus return says we've paid earned interest of $10,000. Couldn't the IRS know from that that that whatever that balance is, $9,500 was from the nonresident alien or I'm just, it seems to me you have so much information already that you would have this information and be able to tell Italy or Russia or China, here's the amount of money we have of your citizens and how about telling us what you have? Well, respectfully, no, Your Honor. Okay. While I do not disagree with necessarily the premise of your question, that you could add up all the 1099s, you could look at the bank's returns for the year. To be honest with you, I'm not too familiar with tax returns by banks, but perhaps there's an expense allocation for, you know, interest paid depositor accounts. But those would be, if you then compare those things and you have a lump sum, you wouldn't know the nationalities, you wouldn't know whether they are individuals or corporations. Corporations are not subject to this requirement. And so you wouldn't have any information there that would actually be useful for another country. If another country, what we are seeking from other countries and what this regulatory requirement helps to provide in exchange in order to create a mutual reporting requirement that goes beyond our shores is to identify who it is, who is receiving interest, and what nationality they are. And so without those two key pieces of information, then I don't know. We will, I don't know, for instance, the United States wouldn't be able to, if we got that information, if Italy said that, you know, there's $2 billion worth of interest that was earned by U.S. citizens, I'm not exactly sure how that would translate to something. My understanding was that there's not perfect reciprocity here. If your regulation goes into effect and you enter into bilateral agreements or maybe treaties already, because the United States is seeking from foreign banks not only interest but the amount that's positive. And that is not information that's being disclosed pursuant to these regulations or any other statute, but the amount of the deposit by a nonresident alien. You might say, well, if we know what the prevailing interest rate is and we can do the calculation, but you can't because you don't know how long the deposit was there for a year. Correct. Well, first of all, I just want to say that you are correct that we are not reporting the amount the nonresidents aliens have in their account. This reporting requirement is strictly the interest. That doesn't necessarily speak to the mutual exchange of information based on the tax information exchange agreement that we have either bilaterally or through a treaty with another country. The requests that are made are done individually. And so, for instance, when the United States receives a request, we not only determine that it's information that the requesting country uses for tax purposes. If the other country doesn't tax interest, then that's not information that we in the general course are going to be providing. Maybe I haven't made my point clear. I thought the United States typically – well, first of all, the United States citizens anywhere in the world are required to report the amount of a – the name of the bank and the amount of the deposit they have. Isn't that correct? I believe so, Your Honor. I mean, it's not in this record. And so the United States, when it seeks information from a foreign bank through the government, is seeking that information. They want to – the United States wants to know whether this particular U.S. taxpayer has accurately reported the amount of the deposit that that taxpayer has in the foreign bank. So – but the United States is not going to be able to give that information to, say, Nigeria because the only information you have is the amount of – if these regs are upheld, it's the amount of the interest. So it's not a mutual – It's mutual in the sense – it's mutual as to interest. But you're right, Your Honor. This isn't trying to – this isn't – we're not trying to – first of all, as was mentioned before, we're not trying to capture the universe. It's only countries that we have treaty obligations with or agreements – exchange agreements with. And it's not all the information that the United States would necessarily be personally interested in. This just deals with – I need to ask you a question not related to that. The plaintiffs here, one of their main arguments is that these regulations are causing capital flight. And I wonder about that in terms of the old problem of causation and correlation. The flight occurred at a time when interest rates in the United States that banks were paying dropped almost to zero. And I – is there any evidence that it's this regulation or the prospect of this regulation that caused the capital flight that the plaintiffs are talking about? No, Your Honor. It's our position that there is no evidence in the record that would substantiate capital flight. In terms of what I believe is – But you assume there was capital flight. I mean, even if you assume that that occurred, the question I have is whether that was caused by the prospect or these regulations. Correct. There's absolutely no evidence that they were caused by the regulations. I believe that the – And the district judge said that, didn't he? Correct. I believe – I see that my time is actually well over, but if I could respond. Go ahead. There are two quick points that I just wanted to make, Your Honor. One, with respect to the specific data I think you were referring to, where you see a dip in individual interest accounts after – a year after the regulatory regime went into effect. So there you've got a problem that you're kind of looking at the wrong period. You're also looking at interest-bearing accounts. It's not necessarily – people who are trying to evade taxes might be shifting from an interest-bearing account to a non-interest-bearing account to avoid the reporting requirement. And so – and the other thing is it kind of gets to, I think, the more fundamental issue, is that we are only sharing information with countries that use that information to tax their citizens. And so, therefore, in general, there would be an independent obligation on the part of these non-resident aliens to report that information in the first place. And so the reason that the exposure that – first of all, we disagree that they would have confidentiality and misuse of information concerns because we think that there are more than adequate safeguards in place to protect that. But even so, the reporting requirement doesn't expose them to those risks if they're meeting their own tax obligations in their own countries by reporting this information in the first place. So the – was it 70 countries that are covered by this? It's in excess of 80. Somewhere I read or heard or whatever that the United States was unique in taxing its citizens on income earned anywhere in the world. Even if they're not – if they're living in a foreign country, they earn income there that they get taxed on it in the United States. And I know there are treaties – one of the – there's a statute that exempts non-resident aliens from having to pay U.S. taxes on their accounts, right? But are all these 70 countries, do they tax income of their citizens earned outside of their jurisdiction? If they didn't tax the interest earned in the United States, then we wouldn't be providing this information. However, there are, you know, for example, other reasons why you might want to have an exchange relationship, even if you aren't taxing the interest earned on U.S. accounts. You might tax interest earned on business activities, even if it's beyond your borders. You might want to – you might be using, you know, for example, with the UBS example, it wasn't necessarily the interest that was creating the massive under-reporting by U.S. citizens keeping Swiss bank accounts secret. It was the fact that they were earning income all over the world, and they were having that income directed to Switzerland, and so shrouding it in its entirety, not just the interest component. And so if you have – if you have that going on by, for example, an Italian citizen, by directing income that should be, you know, for example, generated in Italy, but having it channeled to a bank account in the United States, and then not disclose that bank account, you have – Italy's got the same problem that the United States does. Yeah, but you're not giving the information on the amount of the account. You're only giving them the information regarding interest. That's true, Your Honor, but it does disclose the account. And so once you've disclosed the account – I mean, as we kind of pointed out, there's a GAO study that says once you've got third-party reporting obligations, amongst U.S. citizens, your – the honesty in reporting doubles. It goes from under 50 percent to almost 100. And so, therefore, if that information is – you know, if you have a reporting requirement that covers the globe, the United States expects that its underreporting will go down. And the idea, I believe, is that that is a – there's a global consensus surrounding that, reflected by the fact that these countries are obviously motivated to enter into these exchange relationships. Have you accounted for – I think the plaintiff raised this. The countries – the nonresident aliens – and let's just take a rogue country, Venezuela. One reason – or the main reason they don't deposit in Venezuela is it will be confiscated or they will be subject to extortion, something like that. And so we then turn around and say we've got Carlos so-and-so's $10 million here in the United States, and he's living in that country, and they find out he's put his money in America. I did read that was a concern. I don't know if the plaintiff's brought it up, but – when this rule was being considered. What do our treaties do to try to at least stop that? Well, Your Honor, what we have is we have the safeguards that are explained in the final rulemaking, which is that before we enter into – first of all, we can't exchange information with a country in which we do not have an existing information exchange relationship with. Oh, okay. So they've been – those countries have been vetted on the front end before we enter into a bilateral or multilateral arrangement. Okay, so just to cut this short, the 80 countries we're dealing with are all good guys? All good – I mean, they – I mean, you've got China and Russia there. They have been, but also the individual requests are also reviewed. It's not just that they've passed mustard at one particular point in time. This is a continually monitored process. So when a request comes in, except for countries that we designated to be appropriate to exchange on an automatic basis, there are two categories. There's a have an exchange relationship and then appropriate – countries that are appropriate to exchange automatically. And – but for the countries that are non-automatic, there is an evaluation of each individual request to make sure that they are in compliance with their treaty obligations, to make sure that the information that they're requesting is going to be used for tax purposes. It is not a – this is not a rubber stamp process. Okay. Are Russia and China in the automatic or in the review? No. The automatic ones – there was a REVPROC that was just published that is the follow-on to the 2012 REVPROC cited in our brief in which I believe there are between 10 and 12 in which we have dual tax treaties with. Those are the ones that we work with the closest. They're Senate ratified treaties. And no, China and Russia are not. Okay. Thank you. Does Mr. Leckow have any time left? Okay. Why don't you take just two minutes? Thank you, Your Honor. Two minutes. Two minutes. Wait. The record states as confirmation from Senate 11 that most NRAs, most non-resident aliens are honest. Let's put them to the side. Let's talk about their regulation. The regulation says, and I'm referring to page 8217, this reporting information will directly enhance U.S. tax compliance by making it more difficult for U.S. taxpayers with deposit to falsely claim to be NRAs. That's just inaccurate. It's impossible. It's so easy to circumvent, as I've pointed out. Judge Henderson, you asked about other countries such as, and I don't mean any disrespect for Mexico, Venezuela, Bangladesh, or Ukraine, but you asked about other countries. The IRS's position is we'll have these treaties and trust us we'll assure confidentiality to this mass data program. We're saying that if the IRS wants to get information and share information, you should do it on a particularized basis. If you're going to do mass data collection, which is really all this is, then you've got to analyze what you were doing. They were told. They were told in the record by commanders, not just the American Bankers Association, but the Texas and the Florida bankers about capital flight, and they didn't address it. Do you have standing to argue that this is going to be a problem for nonresident aliens in their home country? That's one of the things we say. The bankers said we have talked with NRAs who are deeply concerned with foreign countries. They put money in the United States because of stability. The concerns articulated in the record are as follows. You're not representing these individuals. If they have a problem in their country, then they ought to be before us, not you. Well, I anticipated that question. The answer to that is that what happens here is the money is here in the United States with the banks. The banks are who are affected by disintermediation. Disintermediation in turn affects the economy. What the IRS did not take into account, it recognized deep down in the 10,000-page record, it recognized that there was a potential for at least $26 billion of capital outflow. That's an awful lot of money. How much is the United States going to gain in anticipated tax revenue? There was no suggestion in the record. All they have are two brothers who in fact would have been caught today under FATCA, which applies to any country, not just these 70 countries. So our position is this belief that this data collection program is going to enhance United States tax compliance is utterly illusory. Thank you, Honor.
judges: Henderson, Kavanaugh, Randolph